UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

CHRISTINA L GERHARD,

Plaintiff,

v.

ANDREW SAUL,

Defendant.

Case No. 18-cv-07516-RMI

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 15

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 6 & 11), and both parties have moved for summary judgment (dkts. 14 & 15). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment and deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole,

considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On February 16, 2017, Plaintiff filed an application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, alleging an onset date of February 11, 2016. *See Administrative Record*[1] ("*AR*") at 10. The ALJ denied the application on July 13, 2018. *Id.* at 18. The Appeals Council denied Plaintiff's request for review on October 15, 2018. *Id*. at 1-3.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff's application for Titles II and XVI benefits alleged disability due to: bone marrow cancer, depression, anxiety, diarrhea, anemia, chronic and constant bone pain, gout, and lack of concentration. *AR* at 243. The ALJ found that Plaintiff's myelofibrosis condition was severe. *Id*. at 12. In this court, Plaintiff assigns error to the ALJ's rejection of Plaintiff's testimony regarding pain, symptoms, and level of limitation. Pl.'s Mot. (dkt 14) at 5-11.

*Medical Evidence from Treating Provider*

Plaintiff had one treating provider – Ethan Schram, M.D. Although Dr. Schram had been Plaintiff's oncologist since April 15, 2013 (*AR* at 557), the first patient-visit records submitted to the ALJ are dated June 1, 2016, (*id*. at 361-67). Dr. Schram noted that Plaintiff was diagnosed with myelofibrosis in February 2013, and she had iron overload from frequent blood transfusions which required chelation therapy and a prescription for Jakafi. *Id*. at 361. Plaintiff had a history of depression, hyperlipidemia, and vitamin B12 deficiency. *Id*. at 362. Dr. Schram also noted that Plaintiff had "more arthritis since starting Jakafi," "brui[s]ing more than before," and a "history of depression and now on Effexor." *Id*. Dr. Schram reviewed Plaintiff's lab tests performed on May 23, 2016. *Id*. at 364. Based on his exam of Plaintiff, Dr. Schram made the following impressions:

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #13. *See* (dkts. 13-1 through 13-11).

2

primary myelofibrosis; pancytopenia secondary to myelofibrosis (symptomatic anemia); macrocytosis; history of depression; alcohol abuse – in remission episodically; symptomatic splenomegaly – now resolved on Jakafi; gout – stable; and iron overload. *Id*. Dr. Schram stated that "[c]omplications of her tranfusional (sic) overload include arthropathy, hepatic and endocrine dysfunction," and thus recommended screening for thyroid function. *Id*. Dr. Schram recommended that Plaintiff continue with medications to control symptoms associated with her blood transfusions. *Id*. at 365-66.

Dr. Ethan Schram also completed a malignant neoplastic disease medical report on June 14, 2018. *Id*. at 557-61. He wrote that Plaintiff had the following signs or symptoms due to her impairments: chronic pain, chronic fatigue, and fibrosis. *Id*. at 557. Plaintiff exhibited severe chronic pain and paresthesia as well as constant edema in both hands, knees, feet, and neck. *Id*. He noted that Plaintiff would be unable to perform or be exposed to routine, repetitive tasks at consistent pace; fast-paced tasks (e.g. production line); and exposure to work hazards (e.g. heights or moving machinery). *Id*. at 558. Plaintiff's medications cause drowsiness and sedation. *Id*. Her impairments could be expected to last at least 12 months. *Id*. Dr. Schram reported that Plaintiff could walk 1-2 city blocks without rest or severe pain as well as sit and stand for up to 20 minutes at one time. *Id*. Plaintiff could sit, stand, or walk for approximately 2 hours total in a 8-hour workday. *Id*. at 559. Plaintiff's symptoms would require her to take up to 8, 10-minute unscheduled breaks to rest throughout an average 8-hour workday due to her pain, paresthesia, chronic fatigue, and the adverse effects of medication. *Id*. Dr. Schram advised that, due to Plaintiff's edema and pain/paresthesia, her legs should be elevated 20-30% of a typical workday. *Id*. Plaintiff could frequently lift less than 10 pounds and occasionally lift 10 pounds. *Id*. at 560. Plaintiff's upper extremities were significantly limited with reaching, handling, and fingering due to pain, paresthesia, and swelling; she could use her hands, fingers, and arms up to 10% of an 8-hour workday. *Id*. Dr. Schram stated Plaintiff would likely be absent from work due to the impairments more than four days per month. *Id*. He added that Plaintiff "has chronic bone marrow failure due to myelofibrosis. This leads to chronic transfusions, iron overload, and arthritis as well as severe fatigue from chronic anemia." *Id*.

3

*Medical Reports of Examining & Non-Examining Consultants*

On May 31, 2017, Dr. Amita Hedge M.D., a non-examining agency consultant, completed a medical source statement. *Id*. at 46-48. Dr. Hedge reviewed Plaintiff's records from consultative examiners and treating providers and found Plaintiff's statements regarding symptoms to be partially consistent except for "level of severity and functioal (sic) limits." *Id*. at 46. Plaintiff had the following exertional limits: 20 pounds for occasional lifting/carrying; 10 pounds for frequent lifting/carrying; 6 hours of standing/walking in a 8-hour workday; 6 hours of sitting in a 8-hour workday; and unlimited pushing/pulling. *Id*. at 47. She reported that Plaintiff could occasionally climb ladders, ropes, and scaffolds. *Id*. Plaintiff's physical limitations were due to myelofibrosis with anemia. *Id*. at 48. Dr. Hedge recommended that Plaintiff avoid concentrated exposure to hazards (machinery, heights, etc.). *Id*.

Dr. J. Bradus M.D., a non-examining agency consultant, completed a medical source statement on October 11, 2017. *Id*. at 85-87. He agreed with Dr. Hedge's findings regarding Plaintiff's exertional limits except for standing and walking. *Id*. Dr. Bradus found that Plaintiff could stand or walk for a total of 4 hours. *Id*. at 86. He also found that Plaintiff could frequently balance, kneel, crouch (i.e. bend at the knees), and crawl. *Id*. Dr. Bradus explained that Plaintiff's limitations were due to foot and knee pain – side effects of her treatment. *Id*. Regarding Dr. Schram's notes, Dr. Bradus found the limitation to sedentary and some light work persuasive and that alleged limitations due to symptoms were "partially supported by the medical and other evidence of the record." *Id*. at 87.

On March 30, 2018, Dr. Soheila Benrazavi, M.D., a consultative examiner, conducted a complete internal medicine evaluation at the request of the Department of Social Security Services. *Id*. at 546. Dr. Benrazavi reviewed records, one by Dr. Schram dated May 30, 2017, and conducted a physical exam of Plaintiff. *Id*. at 546-49. She noted that Plaintiff was diagnosed with myelofibrosis in 2013 and had a history of anemia and multiple blood transfusions. *Id*. at 546. Dr. Benrazavi noted that "part of [Plaintiff's] problem comes from her anxiety and depression, which affects her energy and stamina. The condition of myelofibrosis also causes fatigue to some extent as well." *Id*. Plaintiff's physical exam was within normal limits. *Id*. Dr. Benrazavi found that

4

Plaintiff could frequently lift and carry up to 10 pounds and occasionally lift or carry up to 20 pounds; sit, stand, and walk for 6 hours at one time without interruption for a total of 6 hours in an 8-hour day; and ambulate without a cane. *Id*. at 550-51. Plaintiff could reach, handle, finger, feel, push, and pull frequently with both hands; and use her feet frequently. *Id*. at 552. Dr. Benrazavi found that Plaintiff could frequently perform the following activities: climbing stairs and ramps; climbing ladders or scaffolds; balancing; stooping; kneeling; crouching; and crawling. *Id*. at 553. Plaintiff could go shopping; travel without a companion for assistance; ambulate without an assistive device; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation, climb a few steps at a reasonable pace with the use of a single hand rail; prepare simple meals and feed herself; care for her personal hygiene; and sort, handle, or use paper/files. *Id*. at 555.

*Function Reports*

Plaintiff submitted a function report as well as a third-party function report. In her function report, Plaintiff stated that her illness limited her ability to walk and stand and that she suffered "low hemoglobin (tired all the time), inflammation of joints, diaharea (sic) constant, anxiety, constant pain from myelofibrosis, numerous medication, [and] incurable desease (sic)." *Id*. at 276. Plaintiff's daily activities consisted of showering, eating, and light household duties. *Id*. at 277. Activities that she used to perform but cannot do any longer include: waiting on customers, working an 8-hour day, grocery shop, activities. *Id*. She is unable to sleep a full night because of the pain in her joints and bathroom visits. *Id*. However, she could still perform personal care such as bathing, dressing, using the toilet, and feeding herself, but she needed occasional reminders to take care of personal needs and grooming. *Id*. at 277-78. Plaintiff has difficulty cooking because of the pain associated with standing. *Id*. Regarding housework, Plaintiff could perform light housework for 1 hour 4 days a week, but she cannot do more housework because she is "physically not strong enough." *Id*. at 278-79. Plaintiff would leave the house 3 times per week and either drove herself or rode with a friend to get around. *Id*. She would go grocery shopping once every 2 weeks with the assistance of a friend or grocery store attendant. *Id*. For entertainment, Plaintiff would read or watch television. *Id*. at 280. Her main social activity was

5

talking on the phone with family 3 times per month, and she is unable to socialize on a regular basis due to her illnesses. *Id*. at 280-81. Her illness limited the following activities: lifting, squatting, standing, walking, sitting, kneeling, stair-climbing, memory, completing tasks, understanding, and following instructions. *Id*. She cannot lift 10 pounds, cannot squat due to ankle inflammation, cannot kneel due to ankle inflammation, cannot take the stairs due to joint inflammation and pain. *Id*. Plaintiff can walk 100 feet before she must stop and rest and requires 10 minutes of rest before she can resume walking. *Id*. Plaintiff did not know how long she could pay attention, but she cannot finish conversations, chores, reading, or watching movies. *Id*. She ranked her ability to follow written and spoken instructions at a 4 out of 10. *Id*. Plaintiff did not handle stress well due to her anxiety. *Id*. at 282. Although not prescribed by a medical professional, Plaintiff used a cane, and occasionally a walker, along with a brace to ambulate. *Id*. Plaintiff added that her medications and chemotherapy caused the following side effects: diarrhea, memory loss, swelling of the feet, fear of dying, and sleepiness. *Id*. at 283. She concluded by stating that she started working at the age of 12 and supported herself without assistance up until she became afflicted with myelofibrosis – an incurable disease. *Id*. Now, at 58 years old, she needs assistance to live her last years in dignity. *Id*.

Plaintiff's friend of thirty years, William Constable, submitted a third-party function report. *Id*. at 263-70. Mr. Constable stated that he visited Plaintiff daily, and Plaintiff's impairments rendered her unable to work, and she could not stand or walk for too long. *Id*. Plaintiff's daily activities included showering, eating, and performing household duties. *Id*. at 264. Mr. Constable stated that Plaintiff could no longer wait on customers or work an 8-hour shift, and she cannot sleep because of joint pain and the need for multiple bathroom visits. *Id*. He reported that Plaintiff could not prepare her own meals because, due to her impairments, she could not stand up long enough to cook. *Id*. at 265. Plaintiff could perform household chores for 1 hour a day most days of the week, and lifting and walking are the worst activities for Plaintiff. *Id*. at 265; 268.

//

//

*Hearing Testimony*

At the hearing, Plaintiff testified that she had been diagnosed with bone marrow cancer in 2013, and she continued working as a secretary at a water company. *Id*. at 24-25. However, by 2016, she had to leave her job of 10 years because she "just couldn't do it anymore physically[,] getting up and down, the typing, the filing, the lifting." *Id*. at 25. She had to rest and could not work more than 2 hours; she could resume work after a 2 to 3-hour rest period. *Id*. She testified that she would fall asleep on her lunch hour and was unable to complete tasks. *Id*. In response to questioning by counsel, Plaintiff stated that her previous job required a fair amount of lifting boxes of paper and storage boxes at work, and she was responsible for tasks that required her to get up and down to wait on customers. *Id*. at 26.

The ALJ then questioned Plaintiff about her treatment with Dr. Schram. *Id*. at 27. Plaintiff explained that she underwent blood transfusions because her hemoglobin was down. *Id*. Plaintiff had to take months off of work to undergo the transfusions. *Id*. Plaintiff stated that she took Exjade in the mornings to reduce swelling in her joints and body that was caused by increased iron in her system from the transfusions. *Id*. at 28. Dr. Schram recommended that Plaintiff elevate her legs, and Plaintiff testified that she does elevate her legs for "maybe an hour." *Id*. She also testified that someone takes her shopping and, when she gets home, she cannot put the groceries away until after she takes a rest. *Id*. She added that her anemia caused shortness of breath and her whole body was "not doing what it's supposed to." *Id*. The ALJ asked why Dr. Schram noted that Plaintiff could not perform strenuous physical activity but could carry out light sedentary office work and light housework; Plaintiff responded that, on one hand, tasks which require bending over or scrubbing when cleaning are difficult because her joints stiffen up, but, on the other hand, she could wash her dishes after a meal, load the dishwasher, make her bed, or do laundry. *Id*. at 29-30. When asked to clarify Dr. Schram's note about her ability to perform office work, Plaintiff stated that, although she previously performed secretarial work, now her joints get swollen and painful such that she cannot type like she used to and no longer uses a computer. *Id*. at 30.

The ALJ then asked Plaintiff about her volunteering at the VFW. *Id*. at 31. Plaintiff stated that she assisted with assembling silverware and place settings for breakfast. *Id*. The task would

take about an hour and a half to two hours, and other volunteers distributed the place settings while Plaintiff remained seated. *Id*. Plaintiff estimated that she volunteered at the VFW for six months to one year. *Id*. She stopped volunteering because she could not wake up early enough to arrive by 7:30 in the morning. *Id*.

Plaintiff's counsel then asked the ALJ whether he should clarify the medical source statement with Dr. Schram because it seemed "to eliminate sedentary work." *Id*. The ALJ replied that no clarification was necessary because "other medical documents don't support the level of the limitation addressed in the medical statement. There's no objective medical support for that at that level. There is more objective medical support for light sedentary office work." *Id*.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[2] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 10-18. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 12.

At Step Two, the claimant bears the burden of showing that she has a medically severe

---

[2] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff's myelofibrosis constituted a severe impairment. *AR* at 12.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 13-14. Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a); except that Plaintiff would be limited to walking and standing no more than 4 hours in an 8 hour day and sitting the rest of the day; occasional climbing of ladders/ropes/scaffolds; all other postural frequent; would need to avoid concentrated exposure to hazards and would be off task approximately 3% of the workday; limited to frequent manipulation. *Id*. at 14-17.

At Step Four, the ALJ determined that Plaintiff is capable of performing the equivalent of her past relevant work as an administrative assistant. *Id*. at 17-18. Lastly, the ALJ concluded that, based on the RFC for sedentary work, Plaintiff had not been under a disability, as defined in the Social Security Act, from February 11, 2016, through the date of the issuance of the ALJ's decision, July 13, 2018. *Id*. at 18.

**DISCUSSION**

Plaintiff argues that the ALJ improperly rejected her testimony concerning the intensity, persistence, and limiting effects of her symptoms, and thus the ALJ's decision lacks the support of substantial evidence. Pl.'s Mot. (dkt. 14) at 5-11. Defendant argues that the ALJ provided legally sufficient reasons for rejecting Plaintiff's testimony and only discounted aspects of Plaintiff's

9

testimony that alleged greater limits than the RFC. Def.'s Cross Mot. (dkt. 15) at 3-8.

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but rejected Plaintiff's testimony about the intensity, persistence, and limiting effects by stating that it was "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *AR* at 17. The ALJ stated that Plaintiff's allegations were inconsistent with the medical evidence and Plaintiff's activities of daily living. *Id*.

The assessment of a claimant's credibility regarding the intensity of symptoms requires an ALJ to engage in a two-step analysis. *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). Initially, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ghanim*, 763 F.3d at 1163 (quoting *Vasquez*, 572 F.3d at 591). If the claimant satisfies the first test, and there is no evidence of malingering, the ALJ can then reject a claimant's symptom testimony by giving specific, clear and convincing reasons for the rejection. *Id.*; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). General findings, therefore, will not suffice and an ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Ghanim*, 763 F.3d at 1163; *see also Lester*, 81 F.3d at 834.

Here, because there was no evidence of malingering, Plaintiff's testimony regarding the intensity of her symptoms could not be rejected without providing specific, clear and convincing reasons based on substantial evidence. The ALJ's explanation failed to satisfy that standard. First, the ALJ failed to specifically identify which portions of Plaintiff's testimony were being rejected as "not entirely consistent" with the record. Second, the ALJ did not provide clear and convincing reasons to reject any portion of Plaintiff's testimony. The ALJ stated that "[t]he allegations are inconsistent with the medical evidence of record and the [Plaintiff's] activities of daily living" (*AR* at 17), but there are deficiencies with both bases for rejecting Plaintiff's testimony.

//

10

### 1. Daily Activities

The ALJ simplified Plaintiff's statements to paint a picture of a person who could perform daily activities, but a closer inspection reveals that Plaintiff's abilities were limited to short periods of productivity rather than sustained activity throughout the day. The ALJ recited the following daily activities as inconsistent with Plaintiff's alleged limitations: ability to grocery shop with a friend; drive a car; read and watch television; perform light household duties; do general household chores; do office work but cannot type as quickly as she used to; and volunteer at the VFW for about 6 to 12 months. *AR* at 17. While stated generally, these daily activities could support the ALJ's finding, but Plaintiff's testimony describes durational limitations for each activity which undercuts the ALJ's determination. For example, Plaintiff stated that she prepared meals once a week; performed light household work for 1 hour a day 4 days per week; and grocery shopped bi-weekly for up to 2 hours with assistance from a friend or grocery store employee. *Id.* at 277-80. At the hearing, Plaintiff testified that she must rest for 1 to 2 hours after grocery shopping before putting away her groceries due to her fatigue. *Id.* at 29. Moreover, she testified that, due to swelling of her joints, she can no longer type like she did when she was a secretary. *Id.* at 30. Regarding her volunteer work at the VFW, Plaintiff testified that she spent 1.5 to 2 hours wrapping silverware while seated, but stopped volunteering because she could not get up early enough. *Id.* at 31. Thus, Plaintiff's limited daily activities do not amount to clear and convincing reasons, based on substantial evidence, to reject Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her symptoms.

### 2. Medical Evidence

The ALJ also found that minimal changes in the medical record after January of 2018, and the fact that Plaintiff needed fewer blood transfusions, undermined her symptom testimony. *Id.* at 17. The ALJ states, without explanation, that Plaintiff's credibility was undermined by the "minimal significant changes in the medical record after January of 2018." *Id*. Considering Dr. Schram's report from June of 2018, which showed Plaintiff suffered significant limitations,[3] and

---

[3] The limitations in the report were significant enough that, at the hearing, Plaintiff's counsel asked the ALJ whether he should clarify Dr. Schram's findings as they seemed to eliminate even sedentary work. *See AR*

11

the lack of medical evidence thereafter indicating that Plaintiff improved, the minimal changes in the medical record are not clear and convincing reasons for rejecting Plaintiff's testimony. The ALJ also stated that Plaintiff's testimony was undermined by the fact that she needed fewer blood transfusions. Although Plaintiff needs fewer transfusions, she still needs some transfusions, and the record shows that the transfusions negatively impacted her ability to work. *Id*. at 27-28, 361-63, 560. Thus, it is unclear how the reduced need for transfusions undermines Plaintiff's testimony about the intensity, persistence, and limiting effects of her impairments.

Additionally, the ALJ discussed the medical evidence in such an imprecise way that the court is left to guess upon what medical evidence the ALJ's decision is based. For example, the ALJ rejected non-examining consultants' – Drs. Hedge and Bradus – opinions insofar as they proposed functionality beyond a sedentary work restriction.[4] *Id*. at 16. Dr. Hedge submitted her opinion on May 31, 2017, finding that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; and sit for 6 hours in an 8-hour day. *Id*. On October 11, 2017, Dr. Bradus found that Plaintiff could occasionally lift and/or carry 10 pounds; stand and/or walk for a total of 4 hours in a 8-hour workday; and sit for 6 hours in an 8-hour day. *Id*. The ALJ stated that "I find Dr. Bradus' reduced walking limitation is more consistent with the evidence than the agency consultant's opinion at the initial determination," but the ALJ does not state what evidence Dr. Bradus's opinion was consistent with. *Id*. Likewise, the ALJ assigned partial weight to examining consultant Dr. Benrazavi's opinion that Plaintiff could lift and carry up to 10 pounds; occasionally lift and carry 11 to 20 pounds; and could sit, stand, and walk for six hours in an 8-hour day. *Id*. at 15-16. The opinion was given partial weight because "the claimant's fatigue and persistent symptoms justify a sedentary work finding." *Id*. at 16. The ALJ also assigned Dr. Schram's malignant disease report partial weight because it "was just a statement without any objective

---

at 31. The ALJ declined that invitation to clarify the record. *Id*.

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967 (a).

12

support and no specifics." *Id*. As stated above, Dr. Schram treated Plaintiff for over 3 years and was the only treating provider in the record. In the June 2018 report, Dr. Schram stated that Plaintiff can sit and stand or walk for about 2 hours total in a 8-hour workday, and if Plaintiff had a sedentary job, she needed to elevate her legs 20-30% of the day. *Id*. at 559. The ALJ responded to that finding with what appears to be her own medical advice: "[t]he claimant's leg elevation could occur during off work hours." *Id*. at 16. It is unclear why the ALJ believed that Plaintiff's pain and edema would, or could, wait until Plaintiff had clocked out of work, but that belief is not substantial evidence and cannot form the basis of a clear and convincing reason for rejecting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of symptoms. Thus, because of the ALJ's partial rejection of Drs. Hedge, Bradus and Benrazavi's opinions, which allowed for more functionality than sedentary work, such as carrying, lifting, and walking, and the rejection of Dr. Shram's opinion, which allowed for only two hours of standing, sitting, or walking and leg elevation 20-30% of the day, the RFC is left with no medical evidentiary basis.

The court finds that the ALJ's rejection of some unspecified portions of Plaintiff's testimony was inherently erroneous for two reasons. First, it lacked enough specificity for this court to determine exactly what testimony was rejected and what testimony was accepted. For instance, it is unclear whether the ALJ rejected Plaintiff's testimony that she must rest for 2 to 3 hours for every 2 hours she is active (*id*. at 25); or that she cannot do housework or simple office tasks, like typing, due to swelling in her joints (*id*. at 28-30); or that she elevates her legs for one hour a day (*id*. at 28). Second, the court finds that rejecting any of Plaintiff's testimony based on a simplified misapprehension of the testimony, the third-party testimony, and a hodgepodge of generalizations about the medical evidence fails to meet the clear and convincing standard for rejecting Plaintiff's testimony.

//
//
//
//
//

13

**CONCLUSION**

For the reasons stated above, the court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and **REMANDS** the case for further proceedings in accordance with the guidance provided herein.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: March 12, 2020

ROBERT M. ILLMAN
United States Magistrate Judge